UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

ROBERT MATICAN,

               Plaintiff,

   -against-

CITY OF NEW YORK, JOHN SCHNEIDER,
JULIO C. ORDONEZ, and CHRIS
ZIMMERMAN,

               Defendants.

------------------------------------------------------x

ORIGINAL
DEF

**MEMORANDUM AND ORDER**
Case No. 02-CV-5805 (FB) (KAM)

*Appearances:*
*For the Plaintiff:*
MICHAEL A. HASKEL, ESQ.
167 Willis Avenue
Mineola, New York 11501

*For the Defendants:*
JENNIFER AMY ROSSAN, ESQ.
New York City Law Department
Office of the Corporation Counsel
100 Church Street
New York, New York 10007

**BLOCK, Senior District Judge:**

      Robert Matican ("Matican") sues the City of New York ("City") and three members of the New York City Police Department ("NYPD"): Captain Julio C. Ordonez ("Ordonez"), Lieutenant John Schneider ("Schneider") and Sergeant Chris Zimmerman ("Zimmerman") (collectively, "the officers"). Asserting claims under 42 U.S.C. § 1983 and New York common law, he seeks to hold defendants liable for damages suffered when he was assaulted by a private citizen.

      Pursuant to Federal Rule of Civil Procedure 56, all defendants move for summary judgment on all claims; in addition, Matican cross-moves for summary judgment on his state-law claim. For the following reasons, the Court grants defendants' motion as to the § 1983 claims and declines to exercise jurisdiction over the state-law claim.

# BACKGROUND

"When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The following facts are either undisputed or, if disputed, taken in the light most favorable to Matican:

On September 18, 2001, Matican was arrested for possession of crack cocaine; he claims that while he was awaiting processing in a holding cell, Zimmerman approached him and said, "Robert, we can help you with this. We can make this arrest go away." Matican Dep. at 92. When Matican asked what he had to do, Zimmerman told him he wanted to set up Matican's dealer (whom Matican knew only as "Mike"). Matican then asked, "If I help you and he [i.e., "Mike"] makes bail and he comes after me, will you protect me?" and Zimmerman responded, "Don't worry, Robert, we will look after you. We will protect you." *Id.* at 93. The defendants contest this version of events and claim that Matican volunteered to help Zimmerman and other officers apprehend "Mike" in exchange for favorable treatment from the district attorney's office.

Although the parties dispute who came up with the plan to apprehend "Mike" and when it was formulated, they do not question the plan's existence. Matican claims that one of the officers – perhaps Schneider – suggested arresting both "Mike" and Matican after a face-to-face sale. Matican admits he did not voice any objection to that plan, but attests that "[a]nother cop said, 'Hey, why don't we just let [Matican] point ["Mike"] out and keep him out of it,'" *id.*; Matican "liked that plan better." *Id.* The officers

therefore decided that Matican would be kept out of sight during the operation.

Matican told the officers that he usually bought drugs from "Mike" near the Bayside Jewish Center at 204th Street and 32nd Avenue in Queens, and that "Mike" normally made an illegal u-turn arriving at that location. Based on this information, Matican and the officers agreed that Matican would page "Mike," arrange a buy, and hide at a nearby athletic field with Schneider. Matican would then identify "Mike" when he arrived, whereupon Schneider would radio other officers, including Ordonez, who would stop "Mike" and use the illegal u-turn as a pretext for searching his car.

While discussing the plan, Zimmerman asked Matican, "[H]ow much drugs do you think ['Mike'] will have on him?" Matican Dep. at 109. When Matican said that he believed "Mike" would have "[t]wenty, thirty bags of crack," Zimmerman replied, "If he has that much drugs on him, he is not going to make bail." *Id.*

The officers opened a confidential-informant ("CI") file for Matican; the contents of the file are unknown, as defendants have been unable to locate it.[1] Defendants do not dispute, however, that Matican was given CI status. He was given a desk-appearance ticket and released early on the morning of September 19, 2001.

Later that day, Matican called Zimmerman three times to see if the sting operation was still on. Zimmerman confirmed that it was and, with Schneider and Ordonez, put the prearranged plan in motion.

Matican paged "Mike" and arranged a buy; the meeting was scheduled for

---

[1] Matican seeks an inference in his favor because of the lost file. He does not specify, however, what information allegedly in the file would support his claims.

the same day – September 19 – at 8:00 p.m. and at the usual location. Matican and Schnieder then hid at the nearby athletic field, which was unlit. "Mike" did not arrive until almost an hour after Matican paged him. Schneider claims that, during this interval, he (Schneider) suggested discontinuing the operation, but that Matican wished to proceed; Matican denies this.

"Mike" finally arrived and made his usual illegal u-turn, at which time Matican identified him; Schneider than radioed the other officers. Ordonez and at least four other police officers converged on "Mike's" car in at least three cars; some of the officers were in street clothes and some of the cars were unmarked. According to Edward Mamet ("Mamet"), a retired NYPD officer and "police practices" expert, the "number of officers and police vehicles used was not in accordance with what would be generally used to conduct a traffic stop." Mamet Decl. ¶ 8.[2]

During the subsequent search, "Mike" was found to be in possession of marijuana; he was arrested and taken to the precinct for processing. At the precinct, "Mike," by this time identified as Steven Delvalle ("Delvalle"), was also found to be in possession of crack cocaine. An inventory of his possessions prepared by Officer Kevin Shanahan (who is not a defendant in this case) recites that, in addition to "2 ziplocks of Marijuana," Delvalle was "in possession of 16 ziplocks of crack/cocaine and was attempting to sell them." Decl. of Michael A. Haskel, Ex. V.

---

[2] The defendants argue that Mamet's declaration should be disregarded because he was not disclosed as an expert under Federal Rule of Procedure 26(a)(2). It is not necessary to address this issue as the defendants are entitled to summary judgment whether or not the affidavit is considered.

4

A criminal check at the precinct revealed that Delvalle had several prior arrests, including one for criminal possession of a firearm and another for assault with a box cutter. The officers did not follow up on the disposition of the arrests; had they done so, they would have found that both had resulted in convictions on guilty pleas.

In connection with the sting operation, Delvalle was charged with third- and fourth-degree possession of a controlled substance, making an illegal u-turn, and driving without a license; despite Schneider's prediction, he was released on bail on September 28, 2001. The officers did not know that Delvalle had been released and, as a result, did not contact Matican to inform him. Had he known of Delvalle's release and violent history, Matican claims that he would have moved to California to live with his brother.

Matican had no contact with the officers or Delvalle from September 19 to December 8, 2001. On that date, Delvalle attacked Matican and slashed him across the face with a box cutter; Matican claims that during the assault Delvalle said, "You ratted me.... Why did you rat me?" Matican Dep. at 173. Delvalle was arrested and charged with first- and second-degree assault; he later pleaded guilty to attempted first-degree assault and was sentenced to eight years' imprisonment and five years' supervised release. In connection with the sting operation, Delvalle pleaded guilty to attempted possession of a controlled substance in the third degree and was sentenced to three to six years' imprisonment, to be served concurrently with his sentence for the assault on Matican.

All New York City police officers receive a copy of the Patrol Guide, a comprehensive manual that guides officers in the performance of their duties. The officers involved in apprehending Delvalle relied on Procedure No. 212-68 of the Patrol Guide,

which sets forth procedures for dealing with CIs and, in particular, for keeping their identities confidential; it does not, however, provide specific guidance for protecting the safety of CIs. Apart from Procedure No. 212-68, the City provides additional written guidance for the use of CIs in narcotics operations, but the officers do not recall relying on such guidance; in any event, while the additional written materials broadly caution officers to consider a CI's safety, they do not specify what steps should be taken to achieve that objective. The officers do not recall receiving any other training on how to protect the identity or safety of CIs participating in sting operations.

Referring to a newspaper article, Matican claims that at least nineteen witnesses were killed in New York City between 1980 and 2003. As Matican was not asked or required to testify as a witness, the relevance of this statistic is unclear. The City does not compile statistics on how many CIs are killed or injured in retaliation for their services.

## DISCUSSION

Summary judgment is warranted when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." Fed. R. Civ. P. 56(c). Although, as noted, the Court must view all evidence in the light most favorable to the non-moving party, that party must still come forward with specific facts showing that there is a genuine issue for trial. *See, e.g., Shannon v. New York City Transit Auth.*, 332 F.3d 95 (2d Cir. 2003).

Matican asserts three claims:

(A) a claim under § 1983 that by failing to protect him from the assault by Delvalle, the officers violated his substantive due-process rights under the Fourteenth Amendment;

6

(B) a claim under § 1983 that by failing to adequately train its police officers to prevent such constitutional violations, the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); and

(C) a claim under state law that the officers' failure to protect him amounted to negligence, and that the City is vicariously liable for that negligence under the doctrine of *respondeat superior*.

The Court will consider each in turn.

## A. § 1983 Claim Against the Officers

With regard to Matican's § 1983 claim against the officers, they argue (1) that Matican has failed to establish a constitutional violation, and (2) that, even if he had, they would be entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001), requires the Court to address these issues in sequence; that is, the Court must "ask first whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation . . . . If they do not, the plaintiff may not recover because he has suffered no wrong cognizable under § 1983." *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) (citing *Saucier*, 533 U.S. at 201). "If the facts do establish a constitutional violation, however, [the Court] proceed[s] to a second inquiry, asking 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' . . . If a reasonable officer could have believed that the challenged conduct was lawful at the time of the violation, then qualified immunity bars the claim." *Id.* (quoting *Saucier*, 533 U.S. at 202).[3]

---

[3]The Second Circuit has held that *Saucier*'s sequential approach is not required in certain limited circumstances, such as "when the existence of a constitutional violation depends on the resolution of uncertain state law," *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 58 (2d Cir. 2003), or where "any unsettled constitutional issues raised" will likely be settled outside the context of § 1983 actions. *Koch v. Town of Brattleboro*, 287

7

## 1. Constitutional Violation

Matican claims that the officers' failure to prevent Delvalle's attack violated his right to substantive due process. Whether the Due Process Clause triggers a duty on the part of governmental actors to provide protection against an attack by private actors in a given factual setting is a question of law appropriate for resolution on summary judgment. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 534 (2d Cir. 1993).

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court held that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors," *id.* at 195; thus, "[a]s a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

Relying on *dicta* in *DeShaney*, the Second Circuit has recognized two exceptions to this general rule: First, in *Ying Jing Gan*, the court observed that a governmental actor may have a constitutional obligation to protect an individual from private violence "because of a special relationship with [the] individual." 996 F.2d at 533. Second, in *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993), the court held that the Due Process Clause is implicated if the governmental actor "assisted in creating or increasing the danger to the victim [of private violence]." *Id.* at 99. The court recently summarized the state of the law surrounding these two exceptions in *Pena v. Deprisco*, 432 F.3d 98 (2d

---

F.3d 162, 166 (2d Cir. 2002) (noting that unsettled issues of Fourth Amendment law will often be resolved by rulings on motions to suppress in criminal cases). Those circumstances are not present here.

Cir. 2005).

As *Pena* makes clear, the existence of a special relationship or state-created danger is but the first step in the analysis: "[T]o establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* at 112 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). This restriction exists to prevent the Due Process Clause from becoming a "font of tort law." *Lewis*, 523 U.S. at 848. Thus, "negligently inflicted harm is categorically beneath the threshold of constitutional due process," *Lewis*, 523 U.S. at 849; however, "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005), *quoted with approval in Pena*, 432 F.3d at 113.

### a. Special Relationship

Matican argues that his CI status constitutes a special relationship. Neither the Supreme Court nor the Second Circuit has addressed the issue of whether CI status is the type of special relationship that will support a substantive due-process claim. Both courts, however, have recognized that a constitutionally significant special relationship generally involves some type of custody or other restraint on individuals' ability to fend for themselves. *See DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on

9

his own behalf."); *Ying Jing Gan*, 996 F.2d at 533 ("Special relationships that have been recognized to give rise to a governmental duty to protect against third-person attacks have included custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child.").

District courts in this circuit have deduced from *DeShaney* and *Ying Jing Gan* that there can be no special relationship when such involuntary restraints are not present. *See Clarke v. Sweeney*, 312 F. Supp. 2d. 277, 296 (D. Conn. 2004) (no special relationship between state and subpoenaed witness); *Smith v. Town of East Haven*, 2005 WL 677284 (D. Conn. Mar. 22, 2005) (no special relationship where defendant did not limit plaintiff's freedom of movement or ability to act on her own behalf). For the same reason, other circuit courts have held that there is no special relationship where the plaintiff "voluntarily agreed to serve as a confidential informant." *Summar v. Bennett*, 157 F.3d 1054, 1059 (6th Cir. 1998); *see also Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001) (holding that informant did not fall within special-relationship exception or any other exception to *DeShaney*). Although one district court has held that a special relationship existed between a CI and the police, who had stopped providing protection despite an agreement to do so, *see G-69 v. Degnan*, 745 F. Supp. 254, 265 (D.N.J. 1990), that decision has not been followed. *See Summar*, 157 F.3d at 1059 (referring to *G-69* as a "renegade decision").

Here, there is nothing to suggest that Matican was not free to decline becoming a CI; therefore, he does not fit within the special relationship exception to *DeShaney*.

## b. State-Created Danger

Matican contends that the state-created danger exception applies because the officers increased the likelihood that he would be attacked by handling the sting operation in such a way that Delvalle knew (or at least surmised) that Matican was responsible for his arrest, and by then failing to follow up on – and inform Matican of – Delvalle's violent nature and release from jail. As the Second Circuit recognized in *Pena*, "the term 'state-created danger' can refer to a wide range of disparate fact patterns," 432 F.3d at 108; the issue is whether the particular fact pattern presented here – namely, the execution of the sting operation in a way that compromised Matican's identity – amounts to a state-created danger.

In *Pena*, the Second Circuit noted in *dicta* that "[o]ur distinction between [the two exceptions to *DeShaney*] suggests that 'special relationship' liability arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and the private assailant," 432 F.3d at 109; here, there is no evidence of a relationship between the officers and Delvalle. The Court, however, takes this aspect of *Pena* simply as a passing recognition that many of the circuit's prior state-created danger cases involved a connection between the governmental actor and the private assailant. The Court does not read *Pena* as establishing such a relationship as a *sine qua non* of state-created danger liability; governmental actors may put an individual in harm's way even in the absence of a connection to a private assailant, and the present case is an example. *See also Kneipp v. Tedder*, 95 F.3d 1199, 1208-09 (3d Cir. 1996) (holding that police officer created danger by directing husband to drive home while

11

leaving visibly intoxicated wife to walk home unescorted in cold weather). Thus, that there is no evidence of a relationship between the defendants and Delvalle is of no consequence.

Another aspect of *Pena* provides more significant guidance. *Pena* reiterates that the state-created danger exception applies only when the governmental actor's conduct can be fairly characterized as "affirmative," as opposed to "passive." *Id.* at 109 ("In applying our 'state created danger' principle, we have sought to tread a fine line between conduct that is 'passive' as in *DeShaney* and that which is 'affirmative' as in *Dwares*."). Thus, the court held in *Pena* that encouraging excessive drinking of alcohol on and off duty was sufficiently "affirmative" to trigger the exception, but was careful to point out that simply failing to intercede or punish misconduct would not have been. *See* 432 F.3d at 110-11.

The circuit's other state-created danger cases bear out the active-passive dichotomy. In *Dwares*, for example, the court held that the exception applied because the plaintiff alleged that police officers had told a group of skinheads planning to assault a groups of protesters burning the American flag "that unless they got completely out of control the police would neither interfere with their assaults nor arrest them." 985 F.2d at 97. Similarly, the court applied the exception in *Hemphil v. Schott*, 141 F.3d 412 (2d Cir. 1994), in which the plaintiff, a robbery suspect who had been shot by his victim, alleged that police officers had "aided and abetted" the shooting by allowing the victim, a retired police officer, to accompany them in their pursuit of the plaintiff and by providing the victim with a handgun. *See id.* at 418-20. By contrast, in *Pitchell v. Callan*, 13 F.3d 545 (2d Cir. 1994), the court held that the exception did not apply when an off-duty police officer

12

did not stop another off-duty officer from shooting a houseguest. *See id.* at 549; *accord Clarke*, 312 F. Supp. 2d at 290 (declining to apply the exception to failure to provide police protection to witnesses of murder because "there is nothing in the record indicating that [the police chief] or any of his subordinates encouraged the [murderers] in any way or affirmatively permitted them to victimize [the witnesses]").

If Matican claimed only that the officers had failed to follow up on, and apprise him of, Delvalle's violent nature and release from jail, his claim would fall squarely on the "passive" side of the line. *See Pena*, 432 F.3d at 110 ("Under *DeShaney*, 'allegations that the defendant officers merely stood by and did nothing' are insufficient to state a constitutional violation." (quoting *Dwares*, 985 F.2d at 99)). Matican's claims are not so limited, however; he also claims that the officers executed the sting operation in such a way that Delvalle learned that Matican had set him up. Such conduct falls on the "affirmative" side of the line because, taking the facts in the light most favorable to Matican, it "assisted in creating or increasing the danger to the victim." *Dwares*, 985 F.2d at 99; *cf. Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998) (applying state-created danger exception to city's release of undercover officers' personal information to counsel for drug conspirators).

### c. "Shock the Conscience"

Although the officers' handling of the sting operation can be considered a state-created danger, it does not rise to the level of a substantive due-process violation because, even taking the facts in the light most favorable to Matican, their conduct does not "shock the conscience." There is no indication that the officers intentionally exposed

13

Matican to Delvalle's assault. Moreover, although the officers had time to plan the operation, it cannot be concluded that they were deliberately indifferent to Matican's safety in making those plans: They rejected as too risky a direct meeting between Matican and Delvalle. In addition, they arrived at a plan whereby Matican would be (and was) kept out of sight and, to further distance the sting from the drug buy, used Delvalle's illegal u-turn as a pretext for stopping him and searching his car. While Matican argues that the officers could have done more to insure his safety (most notably, using fewer cars during the sting and following up on Delvalle's bail status), their failure to do so evinces, at best, negligence, which, as noted, is "categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.

### 2. *Qualified Immunity*

As the officers did not violate Matican's substantive due-process rights, his § 1983 claim fails the first step of the inquiry under *Saucier*. Even assuming Matican could make out a constitutional violation, his claim would fail the second step because the officers would be entitled to qualified immunity.

Governmental actors are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

For a constitutional right to be clearly established, there must be binding

14

precedent recognizing it: "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). Furthermore, the "right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.*; *see also McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir. 1992) ("It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books.").

The existence of the special relationship and state-created danger exceptions to *DeShaney* has been clearly established in the Second Circuit since *Ying Jing Gan* and *Dwares* were decided in 1993; however, that level of abstraction does not define the exceptions with adequate specificity to defeat qualified immunity. *Cf. Saucier*, 533 U.S. at 201-02 ("[T]here is no doubt that *Graham v. Connor*, [490 U.S. 386 (1989)], clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough."). The questions is rather whether, at the time of the sting operation in 2001, binding precedent would have reasonably apprised the officers that their conduct fell within one of the

15

exceptions.

As noted, neither the Supreme Court nor the Second Circuit has held that CI status creates a "special relationship" sufficient to trigger a constitutional duty to protect the CI from private violence. Similarly, although the Court is of the opinion that the officers' alleged actions in this case constituted a "state-created danger," there is no binding precedent to put them on notice that using Matican in a sting operation triggered a constitutional duty to protect him from private violence after the operation was concluded. Finally, the Second Circuit cases holding that the requisite conscience-shocking standard had been satisfied have uniformly involved far more egregious behavior, *see Pena*, 432 F.3d at 115 (allowing and encouraging police officers to drink to excess on and off duty); *Hemphil*, 141 F.3d at 418-20 (facilitating robbery victim's ability to shoot robber); *Dwares*, 985 F.2d at 94 (agreeing not to interfere with skinheads' assault on protesters); nothing in those cases would suggest to a reasonable police officer that the officers' handling of the sting operation approached this level of fault. Moreover, the officers' conduct is not the type that is obviously unlawful even in the absence of case law.

For these reasons, the officers' constitutional obligations to Matican were not, in the circumstances and at the appropriate level of specificity, "clearly established"; therefore, even if Matican had established a constitutional violation, the officers would be entitled to qualified immunity.

## B. § 1983 Claim Against the City

Although "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a

16

constitutional tort," *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978), "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[,] the government as an entity is responsible under Section 1983." *Id.* at 694. Matican argues that the City is liable under *Monell* because it failed to adequately train its police officers to protect CIs; however, Matican's failure to establish that the officers violated his constitutional rights is fatal to his *Monell* claim in two ways.

First, where a *Monell* claim is based solely on the actions of a municipality's officers, municipal liability cannot exist if the individual defendants have not violated the plaintiff's constitutional rights. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."). The Court notes that the Second Circuit has cautioned that *Heller* does not apply where "the injuries complained of are not solely attributable to the actions of named individual defendants." *Barrett v. Orange County Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999). In *Barrett*, for example, the court held that a county's human rights commission could be held liable for retaliatory discharge even if individual commissioners were found not liable because the commission itself had made the termination decision. *See id.* at 350. It is clear, however, that *Heller's* principal holding applies to failure-to-train claims because a municipality's failure to train its officers is only actionable if the failure results in constitutional violations by individual officers. *See Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001) ("Following *Heller*, we

have recognized that a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights."). Since the officers did not violate Matican's constitutional rights, *Heller* bars his failure-to-train claim against the City.

Second, to give rise to liability under *Monell*, a municipality's failure to train its officers must amount to "deliberate indifference to the constitutional rights of [its] citizens." *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1993). In *Walker*, the Second Circuit set out three criteria for meeting this standard:

> First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. ... Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. ... Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Id.* at 297-98 (citations and internal quotation marks omitted).

Even assuming that Matican can satisfy the first two prongs of *Walker*, his failure to show that the officers violated his constitutional rights means he cannot satisfy the third; that is, he cannot demonstrate that lack of training caused the deprivation of his constitutional rights because no such deprivation occurred in the first place. Thus, Matican cannot establish that the City's alleged failure to train its officers constituted deliberate indifference to his constitutional rights.

18

## C. State-Law Claim

The Court has jurisdiction over Matican's state-law negligence claim by virtue of 28 U.S.C. § 1367(a), which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Under 28 U.S.C. § 1367(c), however, a district court "may decline to exercise supplemental jurisdiction" if, among other circumstances, "the district court has dismissed all claims over which it has original jurisdiction." As the Court noted in *Drake v. Laboratory Corporation of America Holdings*, 323 F. Supp. 2d 449 (E.D.N.Y. 2004), the Second Circuit has set forth several factors to be considered when deciding whether to exercise supplemental jurisdiction: "(1) whether state law claims 'implicate[] the doctrine of preemption,' ... (2) 'judicial economy, convenience, fairness, and comity,' ... (3) the existence of 'novel or unresolved questions of state law,' ... (4) whether state law claims 'concern the state's interest in the administration of its government.'" *Id.* at 452 (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003)).

Where, as here, all federal claims have been eliminated before trial, concerns of judicial economy, convenience, fairness and comity usually "point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia*, 316 F.3d at 305. Moreover, although Matican's negligence claim does not appear to raise any unsettled issues of state law, the issue of municipal tort liability is the type of "fundamental and complex question[] involving the balancing of important policies of state government" that should normally be left to state courts to adjudicate. *Id.* at 308. As there is no issue of

19

federal preemption or other concern counterbalancing these factors, the Court declines to exercise supplemental jurisdiction over Matican's state-law claim.

## CONCLUSION

With regard to Matican's § 1983 claims, the defendants' motion for summary judgment is granted and those claims are dismissed with prejudice. Matican's state-law claim is dismissed without prejudice.[4]

**SO ORDERED.**

FREDERIC BLOCK
United States Senior District Judge

Brooklyn, New York
March 28, 2006

---

[4] Dismissal of Matican's state-law claim creates no statute of limitations issue. Under 28 U.S.C. § 1367(d), "[t]he period of limitations for any claim [for which supplemental jurisdiction is invoked] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." *See also Jinks v. Richland County*, 538 U.S. 456, 461-65 (upholding § 1367(d) as constitutional both facially and as applied to political subdivisions of states).